Eugene Killian, Jr. (EK-9972)
The Killian Firm, P.C.
555 Route 1 South
Suite 430
Iselin, NJ 08830
(732) 912-2100
ekillian@tkfpc.com

*Of Counsel*:

Frederick Whitmer, (FW-8888)
KILPATRICK STOCKTON LLP
31 West 52nd Street, 14th Floor
New York, NY 10019
(212) 775.8773
FWhitmer@kilpatrickstockton.com

Barry J. Fleishman *(admitted pro hac vice)*
Erica J. Dominitz *(admitted pro hac vice)*
Jennifer Rasile Everitt *(admitted pro hac vice)*
KILPATRICK STOCKTON LLP
607 14th Street, NW
Suite 900
Washington, D.C. 20005
(202) 508-5800
BFleishman@kilpatrickstockton.com
EDominitz@kilpatrickstockton.com
JEveritt@kilpatrickstockton.com

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| FORMOSA PLASTICS CORPORATION, U.S.A., <br><br> Plaintiff, <br><br> vs. <br><br> ACE AMERICAN INSURANCE COMPANY;  ET AL. <br><br> Defendants. | Docket No.:2:06-CV-05055-GEB-ES <br><br> Civil Action <br><br> **MEMORANDUM OF LAW IN OPPOSITION TO PROPERTY DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFF'S CLAIMS FOR "EXCESS EXPENSES" AND NORMAL OPERATING EXPENSES** |

## Preliminary Statement

There are two key questions presented by the Property Defendants' motion for summary judgment relating to coverage under their policies for "Extra Expense." First, is Formosa entitled to Extra Expense coverage when it would normally have cost the company approximately $8 million to manufacture resin at the Illiopolis plant had no loss or damage occurred, but it cost Formosa a total of approximately $11 million to purchase replacement resin and have it shipped to the United States for distribution? The definition of "Extra Expense" provides that the Property Defendants must pay for any expense over and above what it would have cost Formosa to conduct the business of manufacturing resin at the Illiopolis plant following the loss. Accordingly, the Property Defendants must cover the difference between the manufacturing costs had the loss not occurred and the replacement costs following the loss.

Second, should the definition of "Extra Expense" operate to eliminate any possibility of Extra Expense coverage where a catastrophic event results in the complete cessation of business, such that the total operating expenses after the loss can never exceed the total operating expenses before the loss and, therefore, no post-loss expenses of any kind could ever meet the definition of an "Extra Expense"? The answer to that question is, "No," because answering it affirmatively would make the coverage illusory. Moreover, Formosa's reasonable

and necessary post-loss costs that are directly related to the physical damage caused by the fire and explosion at the Illiopolis facility fall squarely within the definition of Extra Expense and should be covered.  Any dispute regarding this matter raises material issues of fact precluding summary judgment.

### Facts

Formosa Plastics Corp. is a full-service manufacturer and supplier of plastic resins and petrochemicals, including PVC (polyvinylchloride).  (Declaration of Roe C. Vadas ¶ 3) (hereinafter "Vadas Decl.").  On April 23, 2004, an explosion and resulting discharge of chemicals created a chain reaction of explosions and fires that killed five plant workers and destroyed much of the plant building at Formosa's Illiopolis, Illinois facility.  (*Id.* ¶ 4).  All of the business Formosa conducted at the Illiopolis facility in manufacturing resins and PVC ceased following the accident and it has not yet resumed.  (*Id.* ¶ 5); (Declaration of Carl A. Salisbury, Exhibit A (Defendants' RFA Resp. 21, 22)).[1]

Formosa's claim for coverage in this case includes the projected cost to rebuild or replace the Illiopolis facility together with the costs actually incurred at the site of the loss ("incurred site costs").  It also includes the extra cost Formosa incurred to replace resin needed to fill its customers' orders, which it would

---

[1]    Formosa will not be resuming production in Illiopolis.  The remaining work at that site consists of remediating the property and environmental damage caused by the accident.

3

normally have manufactured at Illiopolis had it not been for the loss of the plant.  It

seeks this coverage under the provisions of the Property Policy entitled "Extra

Expense" coverage.  The entirety of the language of that provision is as follows

(with key terms highlighted):

1.      **Extra Expense**

(a)  Extra Expense incurred directly **resulting from physical loss, damage, or destruction**         covered herein to real or personal property as described in Clause 8.A. and not otherwise excluded.

(b)  "Extra Expense" means the reasonable and **necessary expenses incurred** during the Period of Recovery **over and above the total expenses that normally would have been incurred to conduct the business had no loss or damage occurred** and shall include the extra costs of temporarily using property or facilities of the insured or others, less any     value remaining at the end of the Period of Recovery for property obtained in connection herewith.

In no event shall these expenses include:  any loss of income; **costs that normally would have been incurred in conducting the business during the same period had no physical loss or damage occurred**; the **cost of physical repair or replacement of property that has been damaged or destroyed**; or any expense recoverable elsewhere in the Policy.

"Normal" as used herein shall mean the condition that would have existed had no physical loss or damage occurred.

Formosa has not manufactured any product at its Illiopolis facility since

April 23, 2004.  (*Id.* ¶ 6).  As a consequence, Formosa was unable to fill customer

orders from its Illiopolis facility.  (Declaration of William A. Warren ¶ 5) ("Warren Decl.").

Formosa has included in its claim to the Property Defendants: (1) the costs to ship finished resin from Illiopolis to Formosa's Delaware warehouse for repackaging, and the repackaging costs themselves;  (2) the extra cost to ship resin to Illiopolis customers from Delaware, over and above the total cost Formosa would have incurred to ship the finished product to its customers from Illiopolis; and (3) the cost to purchase resin from Formosa Taiwan over and above the total cost to produce the same resin at the Illiopolis facility had the loss not occurred. (*Id.* ¶ 5).  Formosa incurred these costs as a result of the fire and explosion and they exceed the total costs that it normally incurred to produce and ship resin from its Illiopolis facility.  The cost to ship finished product from Illiopolis to Formosa's Delaware warehouse for repackaging, and the repackaging costs themselves, was $187,622.  (*Id.* ¶ 7).  The extra costs to ship resin to Illiopolis customers from Delaware, over and above the cost Formosa would have incurred to ship the finished product to its customers from Illiopolis, was $121,972.  (*Id.* ¶ 8).

Formosa intends to prove that the total cost to manufacture the resin at Illiopolis would have been $8,401,253 had the loss not occurred.  It cost $11,135,167 to procure and ship finished resin from Formosa Taiwan.  The excess cost to purchase  resin from Taiwan was $2,733,914.  (*Id.* ¶ 9).  Formosa seeks,

under the Extra Expense provision of the Property Policies, this difference between what it would normally have cost to conduct the business of manufacturing the resin and the amount it did cost to procure, repackage, and ship the replacement resin.

Although Formosa has not manufactured any product at its Illiopolis facility since April 23, 2004, (Vadas Decl. ¶ 6), it has incurred costs at the site other than those for repair and replacement of property that directly and solely arise from the accident at the facility.  If the Illiopolis facility had been shut down under controlled circumstances, absent the fire and explosion, Formosa would not have incurred any of these continuing costs (or would have incurred minimal costs) for electricity, natural gas, water, permits, security, site maintenance and physical examinations and drug screenings.  (*Id.* ¶ 7).  As a result of the April 23, 2004 fire and explosion, the Illiopolis facility was not shut down under controlled circumstances.  Due to the property damage and pollution, Formosa has incurred, and continues to incur, substantial costs to remediate the property damage and pollution at the site before the facility can be completely shutdown.  (*Id.* ¶ 8).

During the period of recovery from the fire and explosion, Formosa incurred costs for electricity to operate the machinery used for the demolition and cleanup, to provide lights and security at the facility, and to operate the small administration building from which the post-loss activities were coordinated.  (*Id.* ¶ 9).  Similarly,

Formosa consumed natural gas to heat buildings to protect equipment during the winter, as well as to assist in burning off certain gases that needed to be removed from the site after the fire and explosion. (*Id.* ¶ 10). Formosa used water to clean equipment at the plant following the fire. (*Id.* ¶ 11). Formosa maintained phone service to coordinate visits to the site, to facilitate demolition and cleanup, and to communicate with vendors performing work at the site. (*Id.* ¶ 12). Formosa had to maintain the proper permits for the facility during the investigation and claims-adjustment process. (*Id.* ¶ 13). It hired security personnel to monitor and protect the integrity of the site. (*Id.* ¶ 14). Finally, Formosa had to pay for physical examinations and drug screenings for the employees that were entering to perform demolition and cleanup activities to ensure that it was safe for them to be performing work at the site. (*Id.* ¶ 15). All of these costs are the result of the physical loss, damage and destruction caused by accident. (*Id.* ¶¶ 8-15).

**Argument**

**I.    There is coverage under the Extra Expense provision of the Policy for the additional cost to produce a certain quantity of resin, over and above the total it would have cost to manufacture the resin had the Illiopolis plant not been destroyed.**

The Property Defendants seek to deny coverage for the extra expense Formosa incurred to replace the customer orders for a certain quantity of resin that it would have manufactured at Illiopolis, if not for the total loss of that plant. They argue that, because the extra cost to procure that resin did not exceed the total costs

7

to operate the entire Illiopolis operations, there is no coverage.  There is no merit to
this argument.

It is hard to imagine a circumstance in which, after a catastrophe completely
destroys a plant, the expenses incurred to "conduct the business" following the loss
will exceed the total expenses incurred when the plant was up and fully running.
Yet, according to the Property Defendants, that is the only circumstance in which
their policies will provide any coverage for Extra Expenses.  There is a more
reasonable and plausible way to interpret the Extra Expense definition that does
not eliminate all coverage in the event of a total loss.  New Jersey law requires that
the policy language be interpreted in any reasonable way that is consistent with
providing, rather than excluding, coverage.  New Jersey courts interpret coverage
limitations narrowly.  *Am. Motorists Ins. Co. v. L-C-A- Sales Co.*, 155 N.J. 29, 41
(1998).  Conversely, courts interpret coverage-granting language in an insurance
policy liberally.  *Mazzilli v. Accident & Cas. Ins. Co. of Winterthur*, 35 N.J. 1, 8
(1961).  "Insurance policies are strictly construed against the insurer, the courts
being obligated to protect the policyholder to the full extent that any fair
interpretation of the policy will allow."  *Id*. at 7.

Here, the key term in the Extra Expense definition is "the business."  The
question under the circumstances is, "What was the business Formosa conducted at
the Illiopolis plant and what did it cost to conduct it normally?"  Part of the

business Formosa conducted at Illiopolis was the manufacture of resin.  Formosa is prepared to show at trial that it cost a total of approximately $8 million to manufacture a certain quantity of resin at the Illiopolis plant before the loss. (Warren Decl. ¶ 9).  Formosa is prepared then to prove that it cost approximately $11 million to acquire, repackage, and ship the same quantity of resin from other sources.  *Id*.  The difference, approximately $3 million, was a reasonable and necessary expense incurred to continue in the resin business following the loss of the plant.  *Id*.  Indeed, it is beyond dispute that the increased cost of transportation to supply products after an accident are covered under extra expense coverage.  *See* Cozen, *Insuring Real Property* (2009) at §3.04(1) ("express delivery" and "extra freight" covered as extra expense when delivery of product to customer is involved).

While Formosa expects the Property Defendants to dispute that it was "reasonable and necessary" to replace the resin at the cost incurred and in the manner employed, those are questions of fact that cannot be decided on a motion for summary judgment.  The question, however, of interpreting the Extra Expense coverage to mean the additional expense to conduct the resin business at the Delaware location -- as opposed to interpreting the coverage to require consideration of all expenses incurred at Illiopolis -- is one for resolution on this motion.

The wording of the Extra Expense definition makes Formosa's claim for the extra resin expenses perfectly reasonable.  In contrast, the Property Defendants' interpretation of the definition is unreasonable under the circumstances.  Nothing in the definition requires that the costs of normally conducting the business of PVC (polyvinylchloride) manufacturing at Illiopolis be added to the cost to conduct the manufacture of resin in order to trigger coverage for the extra expense of producing the resin.  If a plant manufactures, for example, multiple lines of automobiles, and a covered loss shuts down the production of one of the lines, under the Property Defendants' interpretation, there would be no coverage for the additional expense of acquiring replacement cars elsewhere unless the insured could show that the total cost to replace that one affected line of cars exceeded the total cost to produce all lines of cars.  This would be true even if the policyholder met the strict wording of the Extra Expense definition: the expense incurred to procure replacement cars exceeded the total amount it normally cost to manufacture those same cars had no loss or damage occurred.

Formosa does not seek any loss of income on the manufacture of the resin. Formosa also does not seek costs that normally would have been incurred to manufacture the resin had no loss occurred.  It seeks only the difference between what it would have cost to manufacture the resin had no loss occurred and what it

actually cost to obtain the resin from other sources.  The Policy provides coverage

for this Extra Expense.

## II.   Formosa's reasonable and necessary costs incurred solely as a result of the physical damage caused by the Illiopolis accident are covered under the Policy's Extra Expense coverage.

The Property Defendants completely misconstrue the coverage that is granted

under the "Extra Expense" terms of the Policy.  They argue that all costs incurred

after the loss that in theory would have been incurred in any event before the loss

are "normal operating expenses" and excluded from the Extra Expense coverage.

As discussed below, this argument runs contrary to the terms of the Policy and

prevailing law, and their Motion for Summary Judgment should be denied.

As a starting point, the Formosa expenses referenced in Property

Defendants' Motion were not "normal" expenses incurred in the conduct of its

business.  Formosa's normal business operations at Illiopolis totally ceased after

the fire and explosion destroyed that facility.  Absent continuing activities directly

and solely arising because of the accident and loss – adjustment by the carriers,

demolition and cleanup of the facility, wastewater treatment required while the

facility remains subject to environmental review, protection of the property,

security against trespassing and unlawful entry, etc. – the so-called "normal"

expenses would not have been incurred because no business operations were taking

place.  Vadas Decl. ¶9.  Thus, the question before the Court is whether these

extraordinary expenses that would not have been incurred at the destroyed site but for continuing activities directly related to the loss fall within the definition of "Extra Expense" under the specific wording of the Policy.

### A. The Policy's Extra Expense coverage applies to costs reasonably and necessarily incurred as a result of Formosa's covered loss – the Illiopolis fire and explosion.

"Extra expense coverage varies from policy to policy," and every extra expense analysis must begin with the specific policy language at issue. *Understanding Extra Expense*, 45 Tort Trial & Insurance Practice Law Journal 1 (Fall 2009), at 3 ("*Understanding Extra Expense*").  A close review of the Formosa Extra Expense policy language reveals the fallacies of Property Defendants' arguments against coverage for so-called "normal operating expenses."

Under the Policy's grant of "Extra Expense" coverage, Formosa is entitled to recover all "reasonable and necessary expenses incurred during the Period of Recovery" that "result[] from physical loss, damage, or destruction."  In this regard, there are two types of Extra Expense coverage.  First, Extra Expense coverage extends to expenses that would not have been incurred but for the physical loss and were "additional costs incurred in repairing or replacing property."  *See* Cozen, *Insuring Real Property* (2009) at §1.06(4)(b).  These include costs such as those claimed here by Formosa – heating, lighting, security, etc., – that are "reasonably necessary" ancillary costs related to the covered loss

that are not directly for repair or replacement.  *Travelers Indem. Co. v. Pollard Friendly Ford Co.*, 512 S.W.2d 375, 379-80 (Ct. App. Tex. 1974) ("*Pollard*").  In *Pollard*, for example, the court held that security protection, or "watch," was covered as an extra expense because security expenses would not have been incurred when the business was totally shut down but for the need to protect the property while it was being repaired.

Second, and by contrast, the extra expense involved in the resin dispute discussed above relates to costs incurred specifically to continue the business operations at the Delaware location after the loss.  *See* Cozen, *Insuring Real Property* (2009) at §3.04(1).

Property Defendants imply that the Policy's Extra Expense coverage only covers expenses incurred to allow Formosa to continue business operations and so-called "normal operating expenses" do not fit that definition.  However, the Policy does not limit Extra Expense solely to costs incurred to continue business operations after a loss, even though such language unquestionably was available if the Property Defendants had intended to impose such a requirement.  For example, other policy forms in the industry state specifically that Extra Expense must be "to: (1) [a]void or minimize the 'suspension' of business and to continue operations at the described premises."  *Understanding Extra Expense* at 12 (citation omitted).

13

However, Property Defendants did not require this limitation, which they now seek to have grafted into the Policy.  Therefore, this Court should not impose it.[2]

**B.      None of the Policy limitations on Extra Expense recovery apply.**

The Policy contains four basic limitations on Extra Expense coverage.  Two are based on the type and substance of the extra expense incurred, one determines when covered extra expense begins to accumulate, and the last is an overall cap on the amount of recoverable extra expense.[3]  None of these limitations apply to Formosa's loss.

**1.      Formosa's so called "normal operating expenses" costs are Extra Expenses because they were reasonable and necessary, and directly the result of the physical damage caused by the Illiopolis covered loss.**

The first substantive restriction on the Extra Expense coverage is that the expense may not be one that Formosa "normally" would have incurred "in conducting the business during the same period had no physical loss or damage occurred."  The Property Defendants wrongly presume that this restriction means that if the cost was incurred after the loss for an activity that would have taken

---

[2]   This case thereby is distinguishable from *Port Murray Dairy Company v. Providence Washington Insurance Company*, 52 N.J. Super. 350,  356, 145 A.2d 504, 507 (1958) , in which the court found that the policy language at issue limited coverage to "the necessary extra expense incurred by the insured in order to continue the normal conduct of the insured's business during the period of restoration."

[3]   There is an express $10 million limit of liability in the policy for Extra Expense.

place before the loss, the cost automatically is disqualified as an Extra Expense. The Property Defendants are wrong.

The restriction on "normal" costs presumes that some "normal" business continues after the loss, and costs normally associated with that portion of the continuing business is not Extra Expense.  Thus, when a juice manufacturer has a loss that suspends all operations other than peeling of fruit, the electricity costs incurred in the continuing fruit peeling operation are not extra expense.   However, when, as with respect to the Illiopolis plant, the physical loss and destruction cause the entire cessation of business, there is no continuing "normal" business and there also are no continuing costs associated with "normal" business – all costs are Extra Expense, even if they are of the same type that would have been incurred if some business was continuing.  (Declaration of J. Kay Thorne ¶ 5).  So, for example, post-loss electricity costs incurred solely because there is repair or demolition taking place can be covered Extra Expense even though Formosa would have incurred electricity costs in its normal pre-loss operations.[4]

In *Pollard*, the insured's automobile dealership was totally shut down for thirteen days as a result of a tornado.  The question arose whether security, or "watch," costs during the thirteen days was covered as an extra expense.  The

---

[4]     To the extent that the Property Defendants argue that any of the so-called "normal operating expenses" were not related to the loss or were unreasonable or unnecessary, a material fact will be in dispute precluding summary judgment.

insurance company argued that extra expense referred only to costs incurred to continue the policyholder's car business and if the business was shut down, there would be no such costs.  The court rejected this argument and held that the "watch" expenses were "in addition to normal expenses incurred as a result of the direct damage to the buildings," and it allowed these costs as extra expense even though "normal" business activities were completely shut down.  512 S.W.2d  at 379-80.  Similarly, certain incurred costs arising out of damaged property, such as costs of  protecting damaged property, emergency/temporary electrical services, and security costs, were recognized as extra expense (subject to a showing of "necessity") in *Demers Brothers Trucking, Inc. v. Certain Underwriters at Lloyd's, London*, 600 F. Supp. 2d 265, 279-80 (D. Mass. 2009).

As noted above, the Policy language does not limit Extra Expense coverage to costs related to ongoing business activities, even though that language was available and used in other policies.  *Understanding Extra Expense* at 12 (citation omitted).  Rather, the Policy covers Extra Expense both with respect to loss generally arising out of the physical damage and destruction as well as loss arising from attempts to continue to do business.

The second substantive limitation is that the cost cannot be for the "permanent repair or replacement of property that has been damaged or destroyed."  These costs are covered under the property damage grant of coverage

16

and are subject to other valuation and limit of liability provisions of the Policy. The Property Defendants do not contend that any of the so-called "normal operating expenses" were for permanent repair or replacement of damaged property.

Thus, so long as the costs incurred are (i) "directly resulting" from the physical loss or destruction, (ii) "reasonable and necessary," and (iii) not for the "permanent repair or replacement of property that has been damaged or destroyed," the costs qualify as Extra Expense.  All of the so-called "normal operating expenses" raised by the Property Defendants in the Motion are "directly resulting" from the Illiopolis explosion, were "reasonable and necessary," and were not directly for the "permanent repair or replacement" of damaged property. Vadas Decl. ¶¶ 9-16.[5]  To the extent that the Property Defendants dispute any of these contentions, a material issue of fact exists that must be resolved at trial and cannot be resolved by summary judgment.

---

[5]     It is possible that the trier of fact could determine that certain costs the Property Defendants challenge as not Extra Expense could be deemed related to repair and replacement of property damage and thereby covered under the property damage grant of coverage.  This is another reason why Property Defendants' motion for summary judgment should not be granted.

### 2.   Formosa's Extra Expense costs are "over and above" what Formosa would have incurred had no loss taken place.

Covered extra expenses under the Policy begin to accumulate when the total amount of such expenses are "over and above the total expenses that would normally be incurred to conduct the business had no loss or damage occurred." Property Defendants argue that this means Formosa cannot recover extra expenses until the extra expenses exceed the total amount of those expenses Formosa would have incurred before the loss when the business was fully operable.  This obviously makes no sense and would vitiate all Extra Expense coverage because it almost never would be the case that extra expenses incurred after the loss (whether incurred to operate a portion of the business or otherwise incurred if the business is forced completely to cease) would total more than the expense to run the entirety of the business before the loss.

As discussed in Section I. above, the only way that this provision makes sense is to treat the language as meaning that extra expense begins to accumulate when the costs of running whatever business can be run after the loss exceed the costs incurred in connection with the same portion of that business that was running before the event.  In other words, if the only part of a juice factory that can be run after an accident is the fruit peeling process, the Extra Expense coverage would be triggered when the "reasonable and necessary" costs of the peeling business after the event exceed the costs of the peeling business before the event.

If, as is the case here, no business operations can continue at Illiopolis, there are no pre-loss business expenses with which to compare and, as a result, all Extra Expense incurred potentially is recoverable because it is all "over and above" pre-loss expense.

Adopting the Property Defendants' view that the after-loss peeling business costs must be "over and above" the entire pre-loss juice making business costs makes no sense and would eliminate all Extra Expense coverage. For example, renting a new peeling machine to replace a damaged peeling machine clearly would be an Extra Expense. However, the Property Defendants' position is that the rental cost would not be covered unless it exceeded the entire cost of operating the juice plant before the loss. Neither the policy language nor the law support such absurd results. Moreover, allowing Extra Expense coverage when a business can continue operations and thoroughly denying all such costs when the business cannot continue any operations penalizes the policyholder that suffers the more devastating loss. This hardly can be a reasonable interpretation of coverage absent specific policy language calling for such an application of the policy – and there is no such clear language in the Policy.

In short, the so-called "normal operating expenses" cited by the Property Defendants were "reasonable and necessary" costs incurred as a direct result of the "physical loss, damage and destruction" at the Illiopolis plant. Furthermore,

Formosa was unable to engage in <u>any</u> "normal" business activities after the loss because the plant was substantially destroyed and, as a result, all of those "reasonable and necessary" response costs were by definition "over and above" Formosa's pre-loss costs for "normal" business activities and therefore covered under the Extra Expense grant of coverage.  To the extent that the Property Defendants contend otherwise they either are wrong as a matter of law, or they raise material issues of fact for trial.  In either event, Property Defendants' Motion should be denied.

## Conclusion

Formosa seeks only the Extra Expense coverage that the Policy provides, nothing more.  The coverage, by its terms, provides that Formosa is entitled to recover the additional costs incurred to procure and ship replacement resin, over and above the total cost Formosa would have incurred to manufacture the same quantity of resin had the loss not occurred.  Likewise, because there was a total cessation of normal business at the Illiopolis plant as a result of the loss, losses associated with the physical damage at the property but not directly for repair/replacement of damaged property are Extra Expenses, as they were not incurred to conduct <u>any</u> normal business operations.

Dated:     Iselin, NJ         THE KILLIAN FIRM
            June 17, 2010

By:    /s/ Eugene Killian, Jr.    .
Eugene Killian, Jr. (EK-9972)

The Killian Firm, P.C.
555 Route 1 South
Suite 430
Iselin, NJ 08830
(732) 912-2100
ekillian@k-s.com

--and--

KILPATRICK STOCKTON LLP
Barry J. Fleishman, Esq.
Erica J. Dominitz, Esq.
Jennifer Rasile Everitt, Esq.
Kilpatrick Stockton LLP
607 14th Street, NW, Suite 900
Washington, DC 20005
(202) 508-5800

Frederick Whitmer, (FW-8888)
31 West 52nd Street, 14th Floor
New York, NY 10019

Attorneys for Plaintiff Formosa
Plastics Corp.