NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| _____ ) | | |
| FORMOSA PLASTICS CORPORATION, U.S.A., ) | Hon. Garrett E. Brown, Jr. | |
| ) | | |
| Plaintiff, ) | Civ. No. 06-5055 | |
| ) | | |
| v. ) | **MEMORANDUM OPINION** | |
| ) | | |
| ACE AMERICAN INSURANCE COMPANY, ) | | |
| ZURICH AMERICAN INSURANCE COMPANY, ) | | |
| NEW HAMPSHIRE INSURANCE COMPANY, ) | | |
| COMMONWEALTH INSURANCE COMPANY, ) | | |
| ARCH SPECIALTY INSURANCE COMPANY, ) | | |
| EVEREST REINSURANCE (BERMUDA) LTD., ) | | |
| ALLIED WORLD ASSURANCE COMPANY, ) | | |
| LTD., LLOYD'S SYNDICATE 1200 ) | | |
| (AA-1127200) (UK), LLOYD'S SYNDICATE ) | | |
| 1221 (UK), LLOYD'S SYNDICATE 282 (UK), ) | | |
| LLOYD'S SYNDICATE 2003 (UK), CERTAIN ) | | |
| UNDERWRITERS AT LLOYD'S, LONDON, and ) | | |
| COMMERCE AND INDUSTRY INSURANCE ) | | |
| COMPANY, ) | | |
| ) | | |
| Defendants. ) | | |
| _____ ) | | |

**BROWN**, Chief Judge:

This matter[1] comes before the Court on the parties' cross-motions for summary judgment on the application of deductibles under the property insurance policy (Doc. Nos. 125, 140); the parties' cross-motions[2] for summary judgment on Plaintiff's code upgrade claim (Doc. Nos. 124,

---

[1]This matter was reassigned to the undersigned by Order of August 10, 2009.

[2]Although the parties filed separate motions on this issue, the shared subject-matter of the motions and the adverseness of the arguments advanced for and against coverage under this

126); and certain Defendants' motion for summary judgment on Plaintiff's extra expense claims (Doc. No. 127). For the following reasons, this Court will grant in part and deny in part the parties' respective cross-motions regarding the application of deductibles, the Court will grant Defendants' motion and deny Plaintiff's motion regarding Plaintiff's code upgrade claim, and the Court will grant Defendants' motion regarding Plaintiff's extra expense claim.

I.      **BACKGROUND**

The present insurance dispute arises from an April 23, 2004 explosion at the Illiopolis, Illinois plastics manufacturing plant ("Illiopolis plant") operated by Plaintiff Formosa Plastics Corporation, U.S.A. ("Formosa"). Formosa is a Delaware corporation with its principal place of business in Livingston, New Jersey. (Am. Compl. ¶ 1.) According to the parties' representations, the explosion resulted in five fatalities, a number of serious personal injuries, and the loss of a substantial portion of the Illiopolis plant. (*See, e.g.*, Comp. ¶ 18.) At the time of the incident, Formosa had an all-risk property insurance program (hereinafter "Property Policy") jointly underwritten in varying degrees by the following insurance companies: ACE American Insurance Company; Zurich American Insurance Company; New Hampshire Insurance Company; Commonwealth Insurance Company; Arch Specialty Insurance Company; Everest Reinsurance (Bermuda) Ltd.; Allied World Assurance Company, Ltd.; Lloyd's Syndicate 1200 (AA-1127200) (UK); Lloyd's Syndicate 1221 (UK); Lloyd's Syndicate 282 (UK); Lloyd's Syndicate 2003 (UK); and certain underwriters at Lloyd's, London (collectively "Property Defendants"). Most of these Insurers have their principal place of business in either Bermuda or the United Kingdom, while others are located in Canada, Pennsylvania, New York, Wisconsin,

---

provision convinces this Court to treat the parties' motions on this issue as cross-motions.

and Illinois.  The Property Policy held by Plaintiff provided for an aggregate limit of $350

million per loss and a deductible of $5 million per loss.  (Pl.'s Deductibles 56.1 Statement

¶¶ 1–3; Defs.' Deductibles Resp. 56.1 Statement ¶¶ 1–3.)  On October 20, 2006, Plaintiff filed a

Complaint against several of the current Property Defendants and other insurers seeking coverage

it claims it was improperly denied under its insurance policies.[3]

In 2008, several Defendant insurers filed a joint motion to dismiss Formosa's Complaint

on the grounds that Plaintiff's suit was premature under the insurance policy's "no suit"

provision.  On September 22, 2008, the late Honorable Harold A. Ackerman, Senior United

States District Judge, denied these Defendants' joint motion, which he converted into a motion

for summary judgment, finding that the evidence presented a genuine issue of fact regarding

whether Plaintiff had complied with the prerequisites of the "no suit" provision.  *See generally*

*Formosa Plastics Corporation, U.S.A. v. ACE American Ins. Co.*, slip op., Civ. No. 06-5055

(D.N.J. Sept. 22, 2008).  In reaching this decision, Judge Ackerman applied the common policy

language of policy form LUO332575 (referred to as the "Hiscox wording"), which the parties

agreed represented the terms of the disputed insurance coverage.  *Id.* at 4.

Formosa claims $174,692,996 under the Property Policy, and Property Defendants have

made payments to Formosa totaling $114,948,689, which reflects the Property Defendants'

recognition of  $119,948,689 in covered losses, minus the $5-million deductible.  (Defs.'

Deductibles 56.1 Statement ¶¶ 4–5; Pl.'s Deductibles 56.1 Resp. ¶¶ 4–5.)  The remaining

---

[3]Plaintiff filed an Amended Complaint on August 17, 2009, with leave of Court, that
added Defendant insurers to this action.  In the original Complaint, Formosa had named two
other first-party insurers as Defendants, Lloyd's Syndicate 33 (UK) and Lloyd's Syndicate 1414
(UK) (2004), but Formosa voluntarily dismissed its claims against these parties.  (Doc. No. 9
(dismissal of Lloyd's Syndicate 1414 (UK) (2004) with prejudice); Doc. No. 7 (dismissal of
Lloyd's Syndicate 33 (UK) without prejudice.))

$54,744,307 of Plaintiff's claim remains in dispute.  Plaintiff and Property Defendants now move and cross-move for partial summary judgment on Plaintiff's claims under various aspects of the Property Policy.  First, the parties cross-move regarding whether Plaintiff may offset the Property Policy's deductible with losses that exceed the policy's applicable sublimits of coverage.  Next, the parties cross-move regarding whether Plaintiff may claim additional losses under the policy's "Code Upgrade" provision for the increased costs of constructing a replacement plant in compliance with applicable environmental laws and ordinances.  Finally, Property Defendants move for partial summary judgment to the extent that Plaintiff seeks to claim certain post-loss operating expenses under the policy's "Extra Expense" provision.  As before the parties agree that the Hiscox wording embodied in policy form LUO332575 applies to the claims in this case.

## II.    SUMMARY JUDGMENT

A party seeking summary judgment must "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Hersh v. Allen Prods. Co.*, 789 F.2d 230, 232 (3d Cir. 1986).  The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (noting that no issue for trial exists unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict in its favor).  An issue is "genuine" if a reasonable jury could possibly hold in the nonmovant's favor with regard to that issue.  *Id.*

The substantive law identifies which facts are "material."  *Anderson*, 477 U.S. at 247–48. Therefore, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Id.* at 248.  In deciding

4

whether triable issues of fact exist, the court must view the underlying facts and draw all reasonable inferences in the light most favorable to the non-moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *see also Peters v. Del. River Port Auth. of Pa. & N.J.*, 16 F.3d 1346, 1349 (3d Cir. 1994).  The court may not resolve factual disputes or make credibility determinations at the summary judgment stage.  *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).  However, "if the non-movant's evidence on any essential element of the claims asserted is merely 'colorable' or is 'not significantly probative,' the court should enter summary judgment in favor of the moving party."  *Peterson v. AT&T*, No. 99-4982, 2004 WL 190295, at *3 (D.N.J. Jan. 9, 2004) (quoting *Anderson*, 477 U.S. at 249).  To present a genuine issue of material fact, the summary judgment opponent "'need not match, item for item, each piece of evidence proffered by the movant,' but simply must exceed the 'mere scintilla' standard."  *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*, 998 F.2d 1224, 1230 (3d Cir. 1993); *see also Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant].").

With the present motions, the parties dispute the application of three specific insurance terms to Plaintiff's claims: the deductibles provisions, the "Code Upgrade" provision, and the "Extra Expense" provision.  The Court will address each matter in turn, acknowledging the shifting standard for matters brought on cross-motion as necessary.  In his September 22, 2008 Opinion and Order, Judge Ackerman found that New Jersey law applies to Plaintiff's claims, *Formosa Plastics*, slip op. at 28, and neither party disputes this ruling.  Accordingly, the Court will apply New Jersey law to resolve the parties' motions.  This Court has diversity jurisdiction

pursuant to 28 U.S.C. § 1332, because the matter involves diverse parties and the amount in controversy exceeds $75,000.

    *A.  Deductibles Cross-Motions*

        *1.  Material Facts*

The material facts regarding the parties' cross-motions concerning the application of the deductibles provisions are not in dispute.  The Property Policy provides in a section titled "Limits of Liability," Section 3, that the various insurers "shall not be liable for more than its proportion of USD350,000,000 for any one occurrence," and the policy defines the term "occurrence" as "each and every loss or disaster, or series of losses or disasters resulting from a single event." (Morris Decl. Ex. 1 ("Property Policy") §§ 3, 14.)  According to the "Deductibles" section of the policy, Section 4, "[i]n each case of loss covered by this Policy, the [insurers] will be liable only if the Insured sustains a loss in a single occurrence greater than the applicable deductible," which the policy set at $5 million.  (*Id.* § 4.)  Because the Property Policy covered more than one location (*see id.*), the "Deductibles" section further provided that "the deductible will apply against the total loss covered by this Policy in any one occurrence" (*id.* § 4.A).  Section 9 of the policy provides a list of "Coverage Extensions," which includes decontamination costs and professional fees.  (*See* Property Policy § 9.O–P.)

In addition to the above aggregate limit and deductible, the Property Policy provides for sublimits of coverage for decontamination costs and professional fees, capping the former at $2.5 million per occurrence and the latter at $1 million per occurrence.  (*Id.* § 3.H, 3.J.)  The parties agree that Formosa has incurred decontamination costs and professional fees exceeding these sublimits.  (Pl.'s 56.1 Statement ¶¶ 12, 16; Defs.' Resp. 56.1 Statement ¶¶ 12, 16.)  Plaintiff argues that Section VI to the policy's Endorsement No. 8, which sets forth the "Method of

6

Calculation" for the amount payable under the policy, permits Plaintiff to apply these excess losses, even though they exceed the applicable sublimits, to offset or "absorb" its obligation to pay the deductible.

Endorsement No. 8, Section VI provides in pertinent part:

> In calculating the amount, if any, payable under this Policy for a claim including expense of debris removal (as provided for and limited in Clause II of this Endorsement) and/or Resulting Loss (as provided for and limited in Clause V of this Endorsement), the amount of such expense . . . shall be added to:
>
> a.    the amount of the Damage (as defined in Clause II) or the amount of the Original Damage (as defined in Clause V); and
>
> b.    all other amounts, if any, insured under this Policy as a result of the same occurrence that Underwriters hereon agree to pay or, but for the application of a deductible or underlying amount, they would agree to pay;
>
> then the resulting sum shall be the amount to which first all deductibles and then any underlying amounts to which this Policy is subject shall be applied and the balance, if any, shall be the amount payable, subject to all other provisions of this Policy and to the applicable limit(s), sub-limit(s) and aggregate limit(s).

(Property Policy Endorsement No. 8 § VI.)  The parties recognize that the above "Method of Calculation" is limited by the Endorsement's preceding Sections II ("Debris Removal Clause") and V ("Limited Seepage and/or Pollution and/or Contamination Resulting From Physical Damage Caused by Listed Perils Clause") (*see* Defs.' 56.1 Statement ¶¶ 1–2; Pl.'s 56.1 Resp. Statement ¶¶ 1–2), which set the maximum amount for debris removal and resulting loss "that can be included in the method of calculation in Clause VI of [Endorsement No. 8]" at $10 million or 5% of the causing damage, and $2.5 million, respectively (Property Policy Endorsement No. 8 §§ II.2, V.2).

### 2. *Arguments*

Formosa advances three linguistic arguments in support of its contention that it may offset its deductible obligation with otherwise covered losses that exceed the applicable sublimits for decontamination costs and professional fees.[4]  Beginning with the Deductibles provision in Section 4, Formosa notes that the policy provides that the deductible is subtracted from the entire "loss" resulting from a "single occurrence," rather than losses exceeding applicable sublimits.  In support of this contention, Plaintiff cites two district court decisions that applied similarly-designed deductible provisions to the total loss rather than the applicable sublimits.  *See Demers Bros. Trucking Inc. v. Certain Underwriters at Lloyd's, London*, 600 F. Supp. 2d 265, 282–83 (D. Mass. 2009) (finding that the insurance policy's "per occurrence" / "single event"-basis for determining the application of the deductible "mean[t] that the deductible applies to the top of the Insured's aggregate claims rather than the top of the Real and Personal Property sublimit"); *Terra-Adi Int'l v. Dadeland, LLC v. Zurich Am. Ins. Co.*, Civ. No. 06-22380, 2007 WL 675971, at *4–5 (S.D. Fla. Mar. 1, 2007) (deeming the deductible provision susceptible to two interpretations, and adopting the policyholder's contention that the deductible was linked to the total loss claimed, without regard to applicable sublimits).  Next, Plaintiff argues that the enumeration of coverage extensions for decontamination costs and professional fees in Section 9 of the Property Policy demonstrate that these costs are "covered" losses for purposes of the Deductibles provision, notwithstanding the policy's imposition of sublimits on these costs in the "Limits of Liability" section.  Finally, Plaintiff argues that the express language of the  "Method

---

[4]Formosa initially argued that the Property Policy permitted it to offset its deductible obligations by utilizing insurance proceeds from other insurance policies, but Formosa withdrew this argument from consideration by letter of June 15, 2010.  (Doc. No. 133.)  Accordingly, the Court expresses no opinion regarding this issue.

of Calculation" prescribed by Endorsement No. 8 indicates that the deductible is subtracted from the combined losses and damages *before* the application of any sublimits.  (*See* Property Policy Endorsement No. 8 § VI (explaining that the debris removal and Resulting Loss costs "shall be added to . . . the amount of Damage . . . or the amount of the Original Damage . . . ; and . . . all other amounts, if any, insured under this Policy . . . ," and then providing that "the resulting sum shall be the amount to which first all deductibles . . . to which this Policy is subject shall be applied and the balance, if any, shall be the amount payable, subject to all other provisions of this Policy and to the applicable limit(s), sub-limit(s), and aggregate limit(s)").)

Plaintiff supports these language-based arguments by arguing that insurance sublimits typically function as grants of coverage rather than exclusions, and by noting the New Jersey Supreme Court's requirement that coverage exclusions must be "specific, plain, clear, [and] prominent."  *See, e.g.*, *Potenzone v. Annin Flag Co.*, 191 N.J. 147, 152 (2007) (citation omitted). Plaintiff contends that the Property Policy does not contain a clear disclaimer that deductible will be applied to losses limited by coverage sublimits.  Although Plaintiff recognizes that its interpretation of the Deductibles provisions and "Method of Calculation" section of Endorsement No. 8 would enable it to offset, or "absorb," its obligation to pay the deductible, Plaintiff states that this interpretation is consistent with normal claims adjustment practice, as demonstrated by the treatise *Property Loss Adjusting*.  *See* Donna J. Popow, Property Loss Adjusting (3d ed.) §§ 3.47 (indicating that the "general rule" regarding application of the deductible is that "the deductible is taken from the overall loss, and then the specific limits are applied).  Conversely, Plaintiff submits that, if, as Property Defendants argue, the Property Policy does not permit the insured to apply its deductible to its total loss regardless of sublimits, then the policy would provide illusory coverage to a policyholder that suffers a catastrophic loss consisting solely of

9

decontamination costs and professional fees.  Plaintiff speculates that the Property Defendants would deny coverage of a $100-million claim consisting entirely of such costs because the policyholder's "loss," viewed through the lens of the applicable sublimits, would only be $3.5 million, below the $5-million threshold set by the deductible.

Property Defendants respond that Sections II and V of Endorsement No. 8 expressly incorporate sublimits into Section VI's "Method of Calculation," thereby adjusting a policyholder's total loss prior to the application of the deductible.  Property Defendants argue that this understanding of the deductibles provisions complies with the general principle that sublimits *limit* the coverage available under a given policy, and that the deductible does not affect the available coverage.  If the deductible could be applied to non-covered losses, Property Defendants argue, then coverage limitations and deductibles would be meaningless.  In support of this contention, Property Defendants cite cases recognizing that deductibles, by the very nature, cannot be applied to non-covered losses.  *See, e.g.*, *General Star Indem. Co. v. West Florida Village Inn, Inc.*, 874 So. 2d 26, 33 (Fla. Dist. Ct. App. 2004) ("The notion that a deductible could be applied to loss that is not covered by the policy is fundamentally unreasonable.").[5]  Property Defendants also rebut Formosa's claim that a sublimit is a grant of coverage by pointing to treatises characterizing sublimits as limitations in coverage.  *See, e.g.*, Leonard Murphy et al., Property Insurance Litigator's Handbook § 1.03 (2007).  Thus, Property Defendants argue, the "Deductibles" section's reference to "covered" losses does not include losses exceeding the limitations of coverage imposed by the applicable sublimits.

_____

[5]Formosa correctly notes that the *General Star* distinguished between non-covered losses and sublimits, noting that its ruling "d[id] not bear upon the normal claims adjusting practice of absorbing a deductible when the total amount of loss caused by a covered cause of loss exceeds the limits of insurance for that type of loss."  874 So. 2d at 34 n.7.

10

### 3.  Analysis

New Jersey law treats insurance policies as contracts of adhesion that are subject to special rules of interpretation. *Longobardi v. Chubb Ins. Co. of N.J.*, 121 N.J. 530, 537 (1990). Because insurance providers are presumed to be experts in the use of complex contractual instruments, courts in New Jersey "assume a particularly vigilant role in ensuring their conformity to public policy and principles of fairness." *Polarome Int'l, Inc. v. Greenwich Ins. Co.*, 404 N.J. Super. 241, 259 (App. Div. 2008) (quoting *Voorhees v. Preferred Mut. Ins. Co.*, 128 N.J. 165, 175 (1992)).  Towards this end, courts will construe terms in favor of coverage "to the extent that any fair interpretation will allow." *Kievit v. Loyal Protective Life Ins. Co.*, 34 N.J. 475, 482 (1961) (citation omitted).  Consistent with the reasonable expectations of the insured, ambiguities in coverage terms are generally resolved in favor of the insured. *Gibson v. Callaghan*, 158 N.J. 662, 671 (1999); *see also Cruz-Mendez v. ISU/Ins. Servs.*, 156 N.J. 556, 571 (1999).  Whereas coverage-granting provisions will be given a liberal construction, *Gibson*, 158 N.J. at 671, coverage limitations must be clearly stated in the policy, and they will be narrowly applied to policyholders' claims, *see Potenzone*, 191 N.J. at 152 (2007).

However, courts "may not engage in a strained construction to impose a duty on the [insurance provider] that is not contained in the policy," and courts shall not endeavor to "make a better policy for the parties than the one they purchased." *Polarome*, 404 N.J. Super. at 259; *see also Longobardi*, 121 N.J. at 537.  "[A] genuine ambiguity exists only if the 'phrasing of the policy is so confusing that the average policyholder cannot make out the boundaries of coverage.'" *Polarome*, 404 N.J. Super. at 259 (quoting *Weedo v. Stone-E-Brick, Inc.*, 81 N.J. 233, 247 (1979)).  Insurance policy terms are interpreted according to the plain and ordinary meaning; where the terms of the policy are clear, they will be enforced as written. *Polarome*,

11

404 N.J. Super. at 258–59.  Policy terms are properly considered in the context that they appear, when viewed against the policy as a whole, and courts should be wary of interpretations that render other policy terms meaningless.  *See, e.g.*, *Hardy ex rel. Dowdell v. Abdul-Matin*, 198 N.J. 95, 104 (2009).  The insured bears the burden of bringing a claim within the terms of the insurance policy.  *Adron, Inc. v. Home Ins. Co.*, 292 N.J. Super. 463, 473 (App. Div. 1996).[6]

Although both parties in this case present a number of public policy arguments to support their preferred construction of the deductibles provisions, the appropriate starting point is the plain language of the policy terms.  The Property Policy states in the "Limits of Liability" section that the insurers "shall not be liable for more than its proportion of USD350,000,000 for any one occurrence" and imposes the aforementioned limitations on liability for, *inter alia*, decontamination costs and professional fees.  (Property Policy § 3, 3.H, 3.J.)  These terms, fairly read, set the aggregate and item-specific limitations on *liability* under the policy.  Both parties point to the "Deductibles" section (Section 4) of the Property Policy, arguing that the reference to *losses covered* supports their respective arguments.  (*See id.* § 4 ("In each case of *loss covered* by this Policy, the [insurers] will be liable only if the Insured sustains a loss in a single occurrence

---

[6]The Court applies these standards to all of the motions presently before the Court.  The Court notes that Property Defendants argue that a less-insured-friendly standard applies to the policy interpretation in this case under the doctrine of *contra proferentum*, because Formosa participated in the negotiation and drafting of the Property Policy.  *See, e.g.*, *Port Auth. of N.Y. & N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 235 (3d Cir. 2002)  This Court is not persuaded, because Property Defendants present no evidence that Formosa participated in the negotiation and drafting of the Property Policy.  Instead, Property Defendants ask the Court to deduce that Formosa so participated in the formative process on the basis of their assertion that the "Property Policy is a manuscript policy on its face." (Defs.' 56.1 Statement.)  Formosa's participation is not evident from the face of the Property Policy, and Property Defendants' unsubstantiated claim of Formosa's participation is inappropriate at the summary judgment stage.  Accordingly, to the extent that Property Defendants rely on a more lenient standard for the disposition of the other motions, the Court rejects this argument.  In any event, the Court does not believe that the doctrine of *contra proferentum* determines the outcome of this motion.

greater than the applicable deductible . . . ." (emphasis added)).)  This Court disagrees, because the natural reading of this provision, which uses the past participle "covered" and thereby presumes that a *loss* has already been determined to be *covered* under the policy, is that it does not attempt to define what are covered losses.  While subsection A sets parameters for the deductible by instructing that "the deductible will apply against the total loss covered by this Policy in any one occurrence" (*id.* § 4.A), it does not answer the question of what constitutes the total loss covered by the Policy.

The parties acknowledge that the Property Policy does not expressly define the term "loss."  (*See* Pl.'s 56.1 Statement.)  It further appears that the Property Policy does not expressly defines the term "covered loss," though it does provide a section entitled "Coverage" (Section 8) and a list of "Coverage Extensions" (Section 9), the latter of which includes decontamination costs and professional fees in subsections O and P.  (*See* Property Policy §§ 8, 9.)  Formosa asks this Court to define "covered loss" solely by reference to Section 9's coverage extensions, but this Court is persuaded that, based on a fair reading of the entire Property Policy, the prominent limitations on liability appearing in Section 3 would factor into any interpretation of "covered loss."  *See* IRMI Online, Glossary of Insurance Risk Management Terms, http://www.irmi.com/online/insurance-glossary/terms/s/sublimit.aspx (defining "sublimit" as "A limitation in an insurance policy on the amount of coverage available to cover a specific type of loss.  A sublimit is part of, rather than in addition to, the limit that would otherwise apply to the loss.  In other words, it places a maximum on the amount available to pay that type of loss, rather than providing additional coverage for that type of loss." (last visited on November 3, 2010)).

Rather than attempting to divine the definitive meaning of "covered losses" from Sections 3 and 9 to address the parties' respective arguments, however, the Court finds it more prudent to

defer to the express language of Endorsement No. 8's "Method of Calculation," which the parties agree provides a specific formula for determining "the amount . . . payable" under the Property Policy for "Resulting Loss."  According to the Method of Calculation, "Resulting Loss shall be added to: the amount of the Damage . . . or the amount of Original Damage; and all other amounts . . . insured under this Policy as a result of the same occurrence that Underwriters hereon agree to pay or, but for the application of a deductible or underlying amount, they would agree to pay," and *then* "the resulting sum shall be the amount to which first all deductibles and then any underlying amounts to which this Policy is subject shall be applied," and *then* "the balance, if any shall be the amount payable, subject to all other provisions of this Policy and to the applicable limit(s), sub-limit(s) and aggregate limit(s)."  (Property Policy Endorsement No. 8 § VI (internal subdivisions omitted).)  Based on this sequence, the Court reads the formula in three parts as follows:

**Part I**      **RESULTING SUM =  RESULTING LOSS + [DAMAGE or ORIGINAL DAMAGE] + OTHER INSURED AMOUNTS;**

**Part II**     **BALANCE = RESULTING SUM – DEDUCTIBLES – UNDERLYING AMOUNTS; and**

**Part III**    **AMOUNT PAYABLE = BALANCE – AMOUNTS EXCEEDING LIMITS/SUBLIMITS.**

Accordingly, unless the aggregate limit and sublimits are incorporated in Part I, they do not affect the resulting sum of coverage from which the deductible is subtracted, and the deductible is absorbed by losses exceeding these limits and sublimits.

Property Defendants correctly note that Part I of the Method of Calculation expressly incorporates limitations to "debris removal" and "Resulting Loss" provided by the Endorsement's preceding sections II and V, but the Court disagrees with their conclusion (*see*

14

Defs.' Cross-Motion Br. at 19) that these express limitations categorically impose *all* sublimits at this stage of the formula.  Such a deduction is not supported by the text of sections II and V, and it would render the reference to "limit(s), sub-limit(s) and aggregate limit(s)" in Part III of the formula a nullity.  What Sections II and V of Endorsement No. 8 do limit is the "maximum amount" that can be included in the Method of Calculation for "debris removal" ($10 million or 5% of the causing damage) and "Resulting Damage" ($2.5 million).[7]  (Property Policy Endorsement No. 8, §§ II.2, V.2.)  Of these *maximum amounts*, only "Resulting Damage" appears to speak to a sublimit that is disputed by the instant motion—the sublimit for decontamination costs—because Section V of Endorsement No. 8 defines "Resulting Damage" as "seepage onto, and/or pollution and/or contamination of property" directly caused by the original, physical damage to the property.  The *maximum amount* for "Resulting Damage" provided in Section V of Endorsement No. 8 is the same as the *limit to liability* for decontamination costs provided in Section 3 of the Property Policy.  The scope and purpose of the two provisions overlap.  (*Cf.* Property Policy § 9.O ("If insured property is contaminated as a direct result of physical damage insured by this Policy and there is in force at the time of the loss any law or ordinance regulating contamination, . . . then this Policy covers, as a direct result of enforcement of such law or ordinance, the increased cost of decontamination and/or removal of

---

[7]The Court notes that Section V actually imposes a maximum amount for "Resulting Loss," which the Section defines as "Resulting Damage and expense of debris removal and/or cleanup."  However, by including debris removal costs in the term "Resulting Loss," Section V's stricter "maximum amount" purports to abrogate Section II's specific limit for debris removal.  If Property Defendants had intended to cap debris removal at $2.5 million by including it in the definition of "Resulting Loss," there would have been no need for a separate, larger limit specific to debris removal costs.  To avoid rendering the debris-removal-specific limitation in Section II superfluous, and consistent with New Jersey's presumption in favor of insurance coverage, the Court will not read Section V to impose a limitation on debris removal costs for purposes of the Method of Calculation.

such contaminated insured property . . . .").)  Thus, the Court is satisfied that the sublimit for decontamination costs is incorporated into Part I of the Method of Calculation, by virtue of Section V of Endorsement No. 8.  Furthermore, Part I of the Method of Calculation incorporates the maximum amount for debris removal set by Section II of Endorsement No. 8.  Accordingly, to the extent that Formosa has incurred debris removal costs and Resulting Damage in excess of the maximum amounts imposed by Sections II and V of Endorsement No. 8, these excess amounts will not be included in Part I of the Method of Calculation.  However, to the extent that Formosa has incurred professional fees exceeding the applicable sublimit on coverage for this type of loss, Property Defendants have not shown this sublimit to be incorporated into Part I of the Method of Calculation, and these excess costs will be subtracted in Part III.  Necessarily, although the Court cannot determine the amount based upon the parties' submissions, the deductible will be absorbed, in whole or in part, by any professional fees incurred by Formosa in excess of the sublimit for professional fees.

The Court does not find the cases cited by either party particularly persuasive, in light of the unique provisions presented by the Property Policy in this case.[8]  Rather, the Court finds that

---

[8]The Court finds *Demers* distinguishable, and the Court is not persuaded that *General Star* or *Terra-Adi International* compel a different resolution. In *Demers*, where the insurer did not oppose the insured's attempt to recover the deductible, the court explained that the deductible applied against the top of Plaintiff's claims, regardless of sublimits, because the policy stated that the deductible applied "per occurrence," which the policy defined as "any one 'loss', disaster, casualty or series of losses, disasters, or casualties, arising out of one event."  *Demers*, 600 F. Supp. 2d at 282–283.  Given the Property Policy's prominent limitations on liability, the "Deductibles" section's usage of "covered" losses in this case, and Endorsement No. 8's thorough Method of Calculation, the Court is not persuaded that the court's conclusion in *Demers* is applicable here.  Meanwhile, the court in *Terra-Adi International* found ambiguity in the term "total insured values," a term that does not appear in the Property Policy in this case. *See Terra-Adi Int'l*, 2007 WL 675971, at *5.  Lastly, the discussion of "normal claims adjusting practice" in *General Star* is dicta, because that court rejected the argument that a deductible could be absorbed by both covered and covered and excluded causes of loss.  *General Star*, 874

the specific language provided by the Method of Calculation trumps the generic rules of construction provided by the parties.  Although the plain language of the Method of Calculation results in a cumbersome, indirect calculation of the deductible, this calculation of the deductible does not conflict with the "Deductibles" section's statement that "the deductible will apply against the total loss covered by this Policy in any one occurrence."  (Property Policy § 4.A.)  Furthermore, while, hypothetically, this interpretation is susceptible to both parties' absurd-result arguments—the elimination of coverage altogether for sublimit-specific losses exceeding sublimit amounts where the sublimits are less than the deductible, for Plaintiff, and the elimination of deductibles and abrogation of coverage limitations, for Property Defendants—it does not lead to an absurd result under the facts of this case.  Formosa was not categorically denied coverage on the basis of the Property Policy's sublimits, and it would not be an absurd result for the $5-million deductible to be reduced by sums included in Part I of the Method of Calculation, because Plaintiff's total claim is well below the $350 million aggregate limit.  This is the policy language agreed upon by the parties, and this Court may not endeavor to rewrite the policy merely to simplify its formulation of coverage, limitations, and deductibles.

To the extent that Property Defendants believe that this interpretation effectively expands coverage beyond the parameters provided by the policy, consistent with New Jersey's presumption in favor of coverage this Court is duty-bound to enforce specific policy language that effectively permits losses exceeding aggregate limits and sublimits to offset the insured's obligation to pay the deductible.  To the extent that Formosa believes that it is unfair to

---

So. 2d at 35.

incorporate the decontamination costs sublimit into the pre-deductible calculation of losses,

Formosa cannot claim unfair surprise in light of the policy's prominent limitations on liability

listed in Section 3.  For the aforementioned reasons, the Court will grant in part and deny in part

each party's cross-motion for summary judgment on the Property Policy's Deductibles

provisions.

     *B.  Code Upgrade Cross-Motions*

          *1.  Material Facts*

The material facts regarding the parties' cross-motions concerning the application of the

Property Policy's "Code Upgrade" provision are not in dispute.  Subsection A(1) of the Property

Policy's "Coverage Extensions," Section 9, extends coverage to "Demolition and Increased Costs

of Construction" as follows:

> This Policy covers the reasonable and necessary costs incurred, described in
> Item 3 below, to satisfy the minimum requirements of the enforcement of any
> law or ordinance regulating the demolition, construction, repair, replacement
> or use of buildings or structures at an Insured Location, provided:
>
> > a.     Such law or ordinance is in force on the date of insured
> >        physical loss or damage; and
> >
> > b.     Its enforcement is a direct result of such insured physical loss
> >        or damage.

(Property Policy § 9.A(1).)   The parties refer to this provision, Section 9.A, as the "Code

Upgrade" provision.  Item 3 explains that the "Code Upgrade" coverage extends to the cost "to

rebuild [a property] with materials and in a manner to satisfy such law or ordinance; to the extent

that such costs result when the total demolition of the physically damaged property is required to

satisfy such law or ordinance."  (*Id.* § 9.A(3).)

Formosa obtained a construction/engineering firm to conduct an estimate of the costs of

rebuilding, including the costs of compliance with applicable laws, and Formosa currently seeks $9,162,000 under the "Code Upgrade" provision for various costs it claims it will incur to rebuild its plastics plant[9] in compliance with various environmental and workplace safety laws and regulations.  (*See* Defs.' 56.1 Statement ¶ 1; Pl.'s 56.1 Resp. ¶ 1; Defs.' Ex. 11.)  Specifically, Formosa seeks the costs of complying with the following provisions: (1) regulations promulgated under section 112 of the Clean Air Act, 42 U.S.C. § 7412, including 40 C.F.R. §§ 61 and 63 (hereinafter "Clean Air Act regulations"), which Formosa contends requires the use of maximum achievable control technology (MACT) to manage emissions of vinyl chloride and polyvinyl chloride; and (2) 29 C.F.R. § 1910.119(d)(3)(ii), an OSHA regulation that mandates the use of "recognized and generally accepted good engineering practices" (RAGAGEP).  Pursuant to the OSHA regulation's RAGAGEP requirement, Formosa contends that it may apply the following industry guidelines and standards during the reconstruction process, and that the resultant increased costs of construction will be covered by the "Code Upgrade" provision: ANSI/ISA-S84.01-1996 (design of safety interlocks and bypasses on processing equipment); GE GAP 2.5.2 (spacing of process equipment and support facilities, such as control rooms, motor control centers, laboratory and engineering buildings); PIP (process unit and offsite layouts); and NFPA 15 and CCPS Guidelines (design of deluge systems, fire protection).  Property Defendants generally respond that none of these laws, regulations, and guidelines qualify for coverage under the "Code Upgrade" provision.

---

[9]Although not relevant to the policy claims advanced by the parties, the Court understands that Formosa will rebuild in Texas.  (*See* Pl.'s Br. at 4 n.3.)

## 2. *Arguments*

The present motions that this Court treats as cross-motions were filed simultaneously by the parties and therefore talk past one another to some extent.  Property Defendants in their affirmative motion challenge Formosa's code upgrade claim by arguing, *inter alia*, that Formosa has not pointed to an actual "law or ordinance" that would cause it to incur additional costs in the reconstruction of the plastics plant.  Because Formosa's response brief and affirmative motion relies on OSHA and EPA statutes and regulations that it did not identify during its Interrogatory responses, but neither brief presents a factual predicate that Formosa has or will incur increased costs due to compliance with these regulations, Property Defendants respond in their reply brief that Formosa has not put forth a factual predicate to support its claim.  Property Defendants further oppose Formosa's reliance on 40 C.F.R. § 63, Subpart J, because Formosa admitted that the regulation was not a federal or state law or ordinance in its responses to Property Defendants' Requests for Admission.   Moreover, Property Defendants argue that the newly revealed RAGAGEP guidelines relied on by Formosa are not laws, and that the Clean Air Act and OSHA regulations relied on by Formosa do not regulate the "demolition, construction, repair, replacement or use of buildings or structures at [the] Insured Location," and therefore do not fall within the Property Policy's coverage.  Property Defendants argue that Formosa's affirmative motion is procedurally and substantively deficient for the same reasons.

Formosa responds, *inter alia*, that its failure to disclose the additional applicable regulations does not foreclose reliance on the same, because discovery was still open and there was no unfair surprise, because one of the Property Defendants' claims vice president observed in his claims notes for the Illiopolis plant incident, back in 2004, that "there may be considerable requirements by OSHA in the rebuild of the facility in order to comply with 29 C.F.R.

20

§ 1910.119." (*See* Dominitz Decl. Ex. A.).  With regard to its admission concerning 40 C.F.R.

§ 63, Subpart J, Formosa concedes that the admission was made in error, but notes that it was not

an admission of fact, and indicates that it would be willing to withdraw the admission.  As for the

merits of Property Defendants' substantive arguments, Formosa concedes that the guidelines it

relies upon are not laws for purposes of the "Code Upgrade" provision, but contends that,

nevertheless, these guidelines satisfy mandatory requirements imposed by Clean Air Act, OSHA,

and EPA regulations—i.e., observance of RAGAGEP and MACT—and therefore are

incorporated into the coverage extended by the Property Policy.

         *3.  Analysis*

       The Court will deny Formosa's motion for failure to satisfy the burden of production.

According to its opening brief, Formosa seeks a ruling "requiring the Property [Defendants] to

pay the full costs Formosa would incur were it to rebuild the Illiopolis plant in compliance with

OSHA-imposed generally accepted engineering principles and EPA-required Best Available

Technology."  (Pl.'s Br. at 22.)  Towards this end, Plaintiff avers in its brief that it retained the

firm formerly known as ABB Lummus Global, Inc., to prepare an estimate (hereinafter "Lummus

estimate") for costs to rebuild the Illiopolis plant.  Plaintiff further avers in its brief that this

estimate sets forth "(1) the engineering practices and requirements with which Formosa will have

to comply to rebuild the damaged portions of the Illiopolis plant; and (2) an estimate of the costs

of compliance with these requirements."  (*Id.* at 5–6.)  Plaintiff then proceeds to argue that

various EPA and OSHA regulations govern its plans to rebuild the plant, providing grounds for

Formosa to utilize various industry guidelines and standards, all within the auspices of the

coverage provided by the "Code Upgrade" provision.  (*Id.* at 6–9.)  Plaintiff explains that

"[p]lans to rebuild the plant in accordance with federal and state construction standards,

21

including OSHA-required 'Best Available Technology,' have yielded estimates with an anticipated cost that exceeds the amount Formosa's insurers . . . would prefer to pay." (*Id.* at 1.) However, conspicuously absent from Formosa's motion and its Local Rule 56.1 Statement is any citation to specific estimates or costs that Property Defendants have refused to pay, and how these costs relate to the industry guidelines and standards Formosa intends to implement during the rebuilding process.[10]

Property Defendants observed this missing factual predicate in their response brief, and point out that the Lummus estimate "does not cite to any regulations or statutes, and only specifically mentions one of the standards cited in Plaintiff's Interrogatory Responses (GE GAP 2.5.2)." (Defs.' Resp. Br. at 6–7.)  Formosa does not directly respond to this argument in its reply, and this omission is apparent on pages 6–7, where Formosa lists the undisputed facts concerning the issue, but does not identify the costs that it seeks and how they relate to the OSHA and EPA regulations.  (*See* Pl.'s Reply Br. at 6–7.)  Because Formosa fails to present grounds for affirmative relief, the Court will deny Formosa's motion.

Turning to Property Defendants' motion, Property Defendants put Formosa to its proof that it has or will incur additional rebuild costs to comply with laws or ordinances.  At the time Property Defendants filed the motion, it relied on Formosa's Answers to Interrogatories to ascertain Formosa's code upgrade claim.  (*See* Defs.' Br. at 6–7.)  In response to Interrogatory No. 10, which asked Formosa to identify the federal and state laws or ordinances it would rely upon to state a claim under the "Code Upgrade" provision, Formosa listed the aforementioned

---

[10]Formosa's attorney introduces the Lummus estimate in his declaration (*see* Killian Decl. ¶ 6), but Plaintiff does not refer to specific portions of the estimate anywhere in its affirmative motion briefs.

standards and guidelines—ANSI/ISA-S84.01, GE GAP 2.5.2, PIP, NFPA 15, and CCPS

Guidelines—as well as one federal regulation, 40 C.F.R. § 63, Subpart J.  (Defs.' 56.1 Statement,

Ex. 13 (Answers to Interrogatories) at 7–9.)  Formosa concedes that these standards and

guidelines are not laws or ordinances, for purposes of the "Code Upgrade" provision (Pl.'s Resp.

Br. at 3–4), but argues that these standards satisfy OSHA and EPA regulations requiring

compliance with RAGAGEP and MACT.  Through the course of its affirmative and responsive

briefing, the Court understands Plaintiff's "Code Upgrade" argument to rest on the following

OSHA, Clean Air Act, and EPA statutes and regulations: 29 C.F.R. § 1910.119(d)(3)(ii); 29

U.S.C. § 666(e); 42 U.S.C. § 7412(d); and 40 C.F.R. §§ 61, Subpart F, 63, Subpart J.  (*See* Pl.'s

Resp. Br. at 4 & n.2; Pl.'s Reply Br. at 12.)  Property Defendants object that Plaintiff's reliance

on all but 40 C.F.R. § 63 is improper because Plaintiff did not disclose these laws prior to the

instant motions, and in any event that these laws do not "regulat[e] the demolition, construction,

repair, replacement or use of buildings or structures," and therefore do not qualify for coverage

under the "Code Upgrade" provision.  The Court will address each basis for coverage in turn.

　　　With regard to Plaintiff's OSHA-based code upgrade claim, 29 C.F.R.

§ 1910.119(d)(3)(ii) instructs that "The employer shall document that equipment complies with

recognized and generally accepted good engineering practices [RAGAGEP]."  On its face, the

regulation refers to a reporting requirement regarding equipment.  Reference to ascending

subsections in the regulation's hierarchy do not suggest a contrary conclusion.  Subsection (d),

titled "Process safety information," provides in relevant part:

> the employer shall complete a compilation of written process safety
> information before conducting any process hazard analysis required by the
> standard.  The compilation of written process safety information is to *enable*
> *the employer and the employees involved in operating the process to identify*
> *and understand the hazards posed by those processes involving highly*

23

> *hazardous chemicals*. This process safety information shall include information pertaining to the hazards of the highly hazardous chemicals used or produced by the process, information pertaining to the technology of the process, and information pertaining to the equipment in the process.

29 C.F.R. § 1910.119(d) (emphasis added).  The regulation's title and statement of purpose indicate that the regulation is intended to governs *processes* that utilize chemicals and certain flammable liquids.  *See id.* Purpose ("This section contains requirements for preventing or minimizing the consequences of catastrophic releases of toxic, reactive, flammable, or explosive chemicals. These releases may result in toxic, fire or explosion hazards."), § 1910.119(a) (identifying "process[es]" subject to the regulation's requirements).  The Court fails to see how the above regulation's reporting requirement for equipment "regulat[es] the demolition, construction, repair, replacement or use of [Plaintiff's] buildings or structures," for purposes of coverage under the "Code Upgrade" provision.  Plaintiff's other OSHA basis, 29 U.S.C. § 666(e), does not fill in the gap.  This statute provides criminal penalties for employers' willful violations of OSHA regulations that result in the death of an employee.  29 U.S.C. § 666(e). Because Formosa has not demonstrated that an OSHA regulation requires the use of RAGAGEP for the reconstruction of its plastics plant, this statute has no bearing on the question before the Court.

As for Formosa's Clean Air Act and EPA-based code upgrade claim, the portion of 42 U.S.C. § 7412(d)(2) relied on by Formosa provides that "[e]missions standards promulgated under this subsection and applicable to new or existing sources of hazardous air pollutants shall require the maximum degree of reduction in emissions of the hazardous air pollutants subject to this section (including a prohibition on such emissions, where achievable) that the Administrator . . . determines is achievable for new or existing sources in the category or subcategory to which

such emission standard applies . . . ."  While this statute provides *instructions* to the EPA

Administrator for the promulgation of regulations to enforce the statute—namely, that the

regulations promulgated should require the maximum reduction in emissions of hazardous air

pollutants—it does not in and of itself "regulat[e] the demolition, construction, repair,

replacement or use of [Plaintiff's] buildings or structures."  Plaintiff appears to contend that this

statute imposes a standard requiring Maximum Achievable Control Technology (MACT) (*see*

Pl.'s Br. at 7 n.5; Pl.'s Resp. Br. at 4 n.2), but this statutory provision does not refer to, let alone

provide specific guidance on, the types of technologies to be used in reducing emissions.  Thus,

to the extent that Formosa seeks code upgrade costs for complying with the MACT standard, it

must present other authority.  Plaintiff also cites 40 C.F.R. §§ 61, Subpart F, and 63, Subpart J,[11]

which set the national emission standards for vinyl chloride and polyvinyl chloride.  (Pl.'s Resp.

Br. at 4 n.2.)  Formosa does not identify which, if any, of the numerous emissions standards in

these subparts impose standards "regulating the demolition, construction, repair, replacement or

use of [Plaintiff's] buildings or structures."  Nor does Formosa point to evidence that compliance

with standards imposed by these subparts are reflected in the Lummus estimate, or another

estimate, for its costs of reconstruction.  Accordingly, Formosa has not met its burden of

demonstrating that its claim falls within the terms of the Property Policy.  Furthermore, assuming

*arguendo* that these EPA regulations imposed standards "regulating the demolition, construction,

repair, replacement or use of [Plaintiff's] buildings or structures," it appears quite clear that these

emissions standards are excluded from coverage by the "Code Upgrade" provision's Item 4,

_____

[11]As noted above, Property Defendants argue that Formosa's admission that 40 C.F.R. § 63, Subpart J, is not a federal or state law or ordinance forecloses them from doing so now. The Court is not convinced, because Formosa's response was not an admission of fact, but an erroneous conclusion of law.

which states that "[code upgrade coverage] excludes any costs incurred as a direct or indirect result of enforcement of any laws or ordinances regulating any form of contamination including but not limited to the presence of pollution or hazardous material." (Property Policy § 9.A(4).)[12]

Despite four years of litigation, Formosa has not demonstrated that it will incur costs from complying with "law[s] or ordinance[s] regulating the demolition, construction, repair, replacement or use of [its] buildings or structures." In the absence of laws or ordinances requiring compliance with specific standards for buildings and structures, Plaintiff may not pursue code upgrade claims on the basis of industry standards and guidelines. Therefore, the Court will grant summary judgment in favor of Property Defendants on Formosa's code upgrade claims and deny Formosa's cross-motion.

C. *Property Defendants' Motion Regarding Plaintiff's Extra Expense Claims*

1. *Material Facts*

The material facts regarding Property Defendants' motion for summary judgment on Formosa's extra expense claims are not in dispute. Subsection B(1) of the Property Policy's section titled "Coverage," Section 8, extends coverage to extra expenses as follows:

(a)     Extra Expense incurred directly resulting from physical loss, damage, or destruction covered herein to real or personal property as described in Clause 8.A. and not otherwise excluded.

---

[12]The Court notes that, in Formosa's affirmative motion briefs, Plaintiff also argues that compliance with OSHA's RAGAGEP requirement and the EPA's MACT requirement is required by common law tort principles, because the failure to comply with these standards would expose Plaintiff to negligence liability. The Court is not persuaded that Plaintiff's nebulous common law theory, which presumes a court finding of negligence, would satisfy the "Code Upgrade" provision's requirement of a "law or ordinance," but in any event, Plaintiff's failure to demonstrate that it will incur costs from complying with positive law "regulating the demolition, construction, repair, replacement or use of [its] buildings or structures" necessarily precludes this common law theory as well.

(b)     "Extra Expense" means the reasonable and necessary expenses incurred during the Period of Recovery over and above the total expenses that would normally have been incurred to conduct the business had no loss or damage occurred and shall include the extra costs of temporarily using property or facilities of the Insured or others, less any value remaining at the end of the Period of Recovery for property obtained in connection herewith.

In no event shall these expenses include: any loss of income; costs that normally would have been incurred in conducting the business during the same period had no physical loss or damage occurred; the cost of permanent repair or replacement of property that has been damaged or destroyed; or any expense recoverable elsewhere in this Policy.

"Normal" as used herein shall mean the condition that would have existed had no physical loss or damage occurred.

(Property Policy § 8.B(1).)  This motion concerns Formosa's claims for two categories of extra expenses: (1) $3,043,508 for the purchase, storage, repackaging, and shipping of replacement resin from its parent company in Taiwan (hereinafter "resin expenses"); and (2) $3,098,532.10 for post-incident operating expenses, such as utilities, site maintenance, and employee health and safety expenses (hereinafter "operating expenses").  According to the declaration of William A. Warren, an accountant retained by Formosa, the resin expenses include the following costs: $187,622 to ship and repackage finished product at Formosa's Delaware warehouse; $121,972 in additional shipping costs to send finished product to customers from the Delaware warehouse instead of the Illiopolis facility; and an additional $2,733,914 reflecting the price differential for purchasing finished resin from Taiwan at $11,135,167, as opposed to manufacturing the resin at the Illiopolis facility at a cost of $8,401,253.  (Warren Decl. ¶¶ 7–9.)

## 2. Arguments

Property Defendants contend that the "Extra Expense" provision, by its plain terms, does not cover Formosa's resin and operating expenses.  Noting the provision's definition of "Extra

Expense" as "the reasonable and necessary expenses incurred during the Period of Recovery over and above the total expenses that would normally have been incurred to conduct the business had no loss or damage occurred," Property Defendants assert that qualifying extra expenses "actually must be extra, *i.e.*, over and above the total expense to conduct the business that would normally have been incurred." (Defs.' Br. at 19.) Citing an industry text published by the International Risk Management Institute, Property Defendants claim that such coverage is the very nature of extra expense coverage. *See* Linda G. Robinson & Jack P. Gibson, *Commercial Property Insurance* at II.E.13 (4th ed. 1996) (explaining that extra expense coverage "applies only to the portion of the insured's operating expenses that exceed the insured's normal operating expenses"). Property Defendants note that Formosa's average monthly operating expenses, as determined by the accounting firm Buchanan Clarke Schlader (BCS), was significantly greater that the resin expenses sought by Formosa. According to BCS's calculations, which assessed Formosa's operating expenses from January 2004 through March 2004, Formosa's average pre-loss monthly operating expenses totaled $5,336,741.63 (*see* Buchanan Decl. Ex. A.); by comparison, Formosa seeks $3,043,508 in resin costs for the entire loss period, which Property Defendants assert continued up through the filing of the current motion in 2010 (*see* Defs.' Br. at 19). Because these purported "extra expenses" do not exceed "the total expenses that would normally have been incurred to conduct the business had no loss or damage occurred," Property Defendants argue that they do not qualify for coverage under the "Extra Expense" provision. To emphasize this point, Property Defendants point out that Formosa's entire post-loss site costs of $47,862,803, when apportioned over the period of recovery, results in average monthly expenses of $655,654.84, far below the average pre-loss monthly operating expenses. As for the operating expenses sought by Formosa, Property Defendants argue that Formosa has failed to demonstrate

28

which provision of the Property Policy authorizes coverage for these costs; that such costs are normal operating expenses that are not covered by the "Extra Expense" provision; and that such costs would have been covered by business interruption insurance, a type of insurance Formosa declined to purchase.

Formosa responds that the "Extra Expense" provision extends coverage for the additional expenses it incurred in the resin portion of its business, because these expenses reflect the increased cost of purchasing, repackaging, and shipping finished resin, as opposed to manufacturing the resin at the Illiopolis plant. Because Formosa incurred these additional costs as a direct result of the Illiopolis incident, Formosa contends that these extra expenses are covered under the Property Policy. Formosa further contends that nothing in the "Extra Expense" definition requires that the costs of Formosa's other business operations, such as PVC manufacturing, be added to the operating costs of its resin business. With regard to the operating expenses, Formosa argues that these sums are covered by the "Extra Expense" provision because they "would not have been incurred at the destroyed site but for continuing activities directly related to the loss." (Pl.'s Br. at 12.) Formosa contrasts the Property Policy's exemption of "normal" costs, which "presumes that some 'normal' business continues after the loss, and costs normally associated with that portion of the continuing business is not Extra Expense," with the catastrophic event that "cause[d] the entire cessation of business" at the Illiopolis plant, where "there is no continuing 'normal' business and there also are no continuing costs associated with 'normal' business." (*Id.* at 15.) Under these circumstances, Formosa argues that "all costs are Extra Expense, even if they are of the same type that would have been incurred if some business was continuing." (*Id.*) Any other interpretation of the "Extra Expense" provision, Formosa argues, would render its coverage illusory when the insured suffers a catastrophic loss. Towards

29

this end, Formosa cites *Travelers Indemnity Co. v. Pollard Friendly Ford Co.* and the

aforementioned decision in *Demers*, both of which Formosa contends extended extra expense

coverage to post-loss operating costs, even though the normal business ceased to function.  To

the extent that Property Defendants seek to limit extra expense coverage to the post-loss costs of

continuing business operations, Formosa argues that Property Defendants should have adopted

more specific extra expense policy language used in the industry.

> 3.  *Analysis*

This Court agrees with Property Defendants that Formosa has not shown its resin and

operating expenses to fall within the coverage limitations set forth in the "Extra Expense"

provision.  The policy language regarding extra expense coverage is straightforward: "'Extra

Expense' means the reasonable and necessary expenses incurred during the Period of Recovery

over and above the total expenses that would normally have been incurred to conduct the

business had no loss or damage occurred."  (Property Policy § 8.B(1)(b).)  It does not include

"costs that normally would have been incurred in conducting the business during the same period

had no physical loss or damage occurred."  (*Id.* § 8.B(1).)  Contrary to Formosa's argument, the

policy language calibrates the extra expense coverage to costs that exceed the *total expenses* that

would normally have been incurred to conduct *the business*, not a portion of the business.

Accordingly, while the resin expenses may exceed the normal costs of the resin portion of

Formosa's business, such additional costs do not register as extra expenses under the Property

Policy unless Formosa's post-loss expenses exceed the normal total operating expenses for its

entire business.  *See accord Nassau Gallery, Inc. v. Nationwide Mut. Fire Ins. Co.*, No. Civ. A.

00C-05-034, 2003 WL 21223843, at *3 (Del. Super. Apr. 17, 2003) (rejecting extra expenses

claim where the insured "failed to show the relationship between the [post-loss] expenses and the

30

normal expenses"); *Irving v. St. Paul Fire & Marine Ins. Co.*, No. 529336, 1995 WL 356769, at

*3 (Conn. Super. June 6, 1995) (rejecting extra expenses claim where insured's post-loss

expenses did not exceed normal business expenses); Robinson & Gibson, Commercial Property

Insurance at II.E.13 ("It is the *difference between* normal operating expenses and actual operating

expenses that is covered [as extra expense].") (emphasis in original).[13]  The more difficult issue

is what were Formosa's post-loss expenses.

    Both parties appear to operate under the assumption that Formosa's post-loss resin

expenses were $3,043,508, but this sum reflects Formosa's *increased* costs of completing the

resin orders, and thereby includes the price differential of purchasing finished resin at

approximately $11.1 million, as opposed to manufacturing the same at $8.4 million, as well as

additional shipping costs.  Arguably, Formosa's post-loss resin costs were $11,444,761, a sum

that would exceed the normal monthly operating expenses of $5,336,741.63.  However, the Court

cannot make this deduction because Formosa does not give a timeline for its resin costs.  Thus,

any comparison of pre-loss and post-loss costs would be akin to comparing apples with oranges.

---

[13]Formosa's reliance on *Pollard* and *Demers* is misplaced.  *Pollard* involved a car
dealership's extra expense claim in the aftermath of tornado damage that temporarily closed the
facility.  The dealership continued to operate at a different facility during the period of recovery.
*Pollard*, 512 S.W. 2d at 380.  After discussing the various different costs that the dealership
incurred during this transition and recovery period, the court ultimately compared the post-loss
expenses for the three months following the tornado with the pre-loss expenses.  *Id.* at 381 ("We
notice that Pollard claimed and the court found that the fixed expenses for May, June and July of
1970 were in excess of normal expenses by the sum of $47,485, all of which were attributable to
the tornado.") Thus, while *Pollard* may support Formosa's argument that post-loss operating
expenses were not *normal* operating expenses excluded by the policy, it does not support
Formosa's argument that these costs are covered extra expenses regardless of the normal
operating expenses.  *Demers* appears to have dealt with a different formulation of extra expense
coverage, predicated on "the necessary expenses that are incurred during the 'period of
restoration' that would not have been incurred if there had been no direct physical 'loss' to the
Insured's Real and Personal Property which is covered under this policy."  *Demers*, 600 F. Supp.
2d at 270.  Accordingly, *Demers* does not advance Formosa's argument in favor of coverage.

Formosa does not challenge BCS's calculation of Formosa's normal pre-loss monthly operating expenses. Thus, the fact that Formosa's figure for the normal cost of manufacturing resin ($8,401,253) exceeds Formosa's normal pre-loss monthly operating expenses ($5,336,741.63) by a considerable sum, notwithstanding the fact that the resin business is only a portion of Formosa's business (*see* Pl.'s Br. at 10 (noting the PVC portion of Plaintiff's business)), provides a strong indication that Formosa incurred its post-loss resin costs over a prolonged time frame during the period of recovery. Because Formosa does not suggest that its post-loss resin expenses exceeded its pre-loss normal operating expenses, the Court must deny this portion of Formosa's extra expense claims.

Formosa's claim for operating costs necessarily fails as well, because the operating costs ($3,098,532.10) Formosa seeks under the "Extra Expense" provision does not exceed the pre-loss normal operating costs. Even if one were to add the resin expenses to the operating expenses, resulting in post-loss costs of approximately $14 million, Formosa does not contend that it incurred these costs in a single month, so the sum must be applied over the course of the period of recovery. Because Formosa does not suggest that its post-loss operating expenses exceeded its pre-loss normal operating expenses, the Court must deny this portion of Formosa's extra expense claims.

With regard to Formosa's argument that this interpretation of the "Extra Expense" provision results in illusory coverage in the event of a catastrophic loss, the Court disagrees. The "Extra Expense" insurance in this case provided Formosa with coverage for "reasonable and necessary expenses incurred during the Period of Recovery over and above the total expenses that would normally have been incurred to conduct the business had no loss or damage occurred." This coverage is the epitome of extra expense insurance: to "reimburse an insured for

32

additional costs to continue operations at the original location or to move and set up operations at another location."  Stephen A. Cozen, *Insuring Real Property* § 1.06[4][b] at 1–52 (2009).  It was not designed to cover the type of catastrophic loss that results in a complete cessation of business.  *Id.* § 3.04[1] at 3–84 n.3 (noting that extra expense coverage "assumes . . . that normal operations can be continued by incurring extraordinary expense," and explaining that "it makes no sense to carry extra expense coverage" if continued operations are not feasible).  The extra expense coverage in this case is not illusory, it just was not intended to cover this sort of occurrence.  It is not for this Court to remedy Formosa's failure to procure adequate insurance for the risks attendant to its business.  Because Plaintiff has not shown that its post-loss resin and operating expenses exceed the pre-loss normal operating expenses, the Court will grant Property Defendants' motion for summary judgment on Plaintiff's extra expense claims.

## III.    CONCLUSION

For the aforementioned reasons, this Court will Court will grant in part and deny in part the parties' respective cross-motions regarding the application of deductibles (Doc. Nos. 125, 140); the Court will grant Property Defendants' motion (Doc. No. 124) and deny Plaintiff's motion (Doc. No. 126) regarding Plaintiff's code upgrade claim; and the Court will grant Property Defendants' motion regarding Plaintiff's extra expense claims (Doc. No. 127).  An appropriate form of Order accompanies this Memorandum Opinion.


Dated: November 9, 2010

                                                    /s/ Garrett E. Brown, Jr.
                                                    GARRETT E. BROWN, JR., U.S.D.J.